Filed 7/30/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| 1041 20TH STREET, LLC,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>SANTA MONICA RENT CONTROL BOARD,<br><br>     Defendant and Appellant. | B290242<br><br>(Los Angeles County<br>Super. Ct. No. SS028966) |
| ASN SANTA MONICA, LLC,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>SANTA MONICA RENT CONTROL BOARD,<br><br>     Defendant and Appellant. | B290956, B291240<br><br>(Los Angeles County<br>Super. Ct. Nos. SS026542,<br>SS029136) |

APPEALS from judgments of the Superior Court of Los Angeles County, Gerald Rosenberg, Judge. Reversed with directions.

Donald F. Woods, Jr., for Plaintiff and Appellant.

Santa Monica Rent Control Board, J. Stephen Lewis; Best Best & Krieger, John C. Cotti and Gregg W. Kettles for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

## I. INTRODUCTION

Plaintiffs, 1041 20th Street, LLC and ASN Santa Monica, LLC, filed petitions for writs of administrative mandamus (Code Civ. Proc., § 1094.5), and 1041 20th Street, LLC also filed a complaint for declaratory relief, requesting, among other things, a finding that defendant Santa Monica Rent Control Board (the Board) was equitably estopped from asserting that rental properties were subject to rent control.[1]  The trial court granted the petitions and the requested declaratory relief.  The Board appeals, contending that it did not have authority to permanently exempt rental units from rent control by a permit pursuant to the

---

[1]     The rental properties at issue are located at 1041 20th Street (20th Street property) and 1915 Ocean Avenue (Ocean Avenue property) in Santa Monica (sometimes collectively referred to as the rental properties).  1041 20th Street, LLC is the current owner of the 20th Street property, and ASN Santa Monica, LLC is the current owner of the Ocean Avenue property.  This appeal refers to the prior and current owners of those properties.  For ease of reference, we will refer to the current and prior owners of the 20th Street property as "20th Street Owner" and to the current and prior owners of the Ocean Avenue property as "Ocean Avenue Owner."

2

Santa Monica City Charter, article XVIII, section 1803(t),[2] and thus could not be equitably estopped. We agree and reverse.[3]

---

[2] Later undesignated section references are to article XVIII of the Santa Monica City Charter, known as the Rent Control Law. We will adopt the terminology used by the parties and refer to permits obtained pursuant to section 1803(t) as "removal permits."

[3] The Board moved to dismiss 20th Street Owner's cross-appeal, asserting that plaintiff lacked standing because it was not aggrieved. "In a mandamus proceeding, just as in a civil action, '[a]ny party aggrieved may appeal' from the final judgment. (Code Civ. Proc., . . . §§ [902,] 904.1, subd. (a)(1), 1109.) 'One is considered, "aggrieved" whose rights or interests are injuriously affected *by the judgment*.' [Citation.] Conversely, '[a] party who is not aggrieved by an order or judgment has no standing to attack it on appeal.'" (*El Dorado Irrigation Dist. v. State Water Resources Control Bd.* (2006) 142 Cal.App.4th 937, 977.) In its cross-appeal, 20th Street Owner seeks only to affirm the judgment below and argues alternative grounds to affirm. Because 20th Street Owner does not seek additional relief, it is not aggrieved and we dismiss the cross-appeal. We will, however, address 20th Street Owner's alternative arguments to the extent they are directly responsive to the Board's appeal. (See *Little v. Los Angeles County Assessment Appeals Bds.* (2007) 155 Cal.App.4th 915, 925, fn. 6 ["Respondents are free to urge affirmance of the judgment on grounds other than those cited by the trial court"].)

## II. BACKGROUND

A.    *Santa Monica's Rent Control Law*

"In April 1979, the City of Santa Monica (the City) adopted a rent control charter amendment (. . . the Rent Control Law) and created an elected rent control board (Board) to regulate rentals. Among other things, the Rent Control Law requires that owners register each rental unit and pay annual registration fees to the Board, establishes maximum allowable rents, provides for annual general adjustments and individual adjustments of allowable rents, prohibits evictions except for specified reasons, and prescribes remedies for violations of its provisions." (*Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 957 (*Santa Monica Beach*).)

"The stated purpose of the Rent Control Law, as expressed in the preamble to the charter amendment[s], [is] as follows: 'A growing shortage of housing units resulting in a low vacancy rate and rapidly rising rents exploiting this shortage constitute a serious housing problem affecting the lives of a substantial portion of those Santa Monica residents who reside in residential housing. In addition, speculation in the purchase and sale of existing residential housing units results in further rent increases. These conditions endanger the public health and welfare of Santa Monica tenants, especially the poor, minorities, students, young families, and senior citizens. The purpose of this Article, therefore, is to alleviate the hardship caused by this serious housing shortage by establishing a Rent Control Board empowered to regulate rentals in the City of Santa Monica so that rents will not be increased unreasonably and so that

4

landlords will receive no more than a fair return.'" (*Santa Monica Beach, supra,* 19 Cal.4th at p. 957.) One stated intent of the Rent Control Law is "to enable the Board to provide relief to persons facing particular hardship and to protect and increase the supply of affordable housing in the [C]ity." (*Id.* at p. 988.) Another purpose is to "attempt[] to provide reasonable protections to tenants by controlling removal of controlled rental units from the housing market . . . ." (§ 1800.)

Section 1803(t) provides one means for controlling removal of units from the housing market, the removal permit. It states: "Any landlord who desires to remove a controlled rental unit from the rental housing market by demolition, conversion or other means is required to obtain a permit from the Board prior to such removal from the rental housing market in accordance with [the] rules and regulations promulgated by the Board. In order to approve such a permit, the Board is required to find that the landlord cannot make a fair return by retaining the controlled rental unit." (§ 1803(t).)

In 1983, the Board implemented regulations that govern the granting of removal permits. Those regulations, which are currently suspended, describe four categories of removal permits. Category A permits are for landlords who are "unable to collect the current Maximum Allowable Rent (MAR) on the unit." Category C permits are for landlords who prove a controlled rental unit "is uninhabitable and cannot be made habitable in an economically feasible manner."

In 1984, voters approved an amendment to the Rent Control Law which was intended, among other things, "to ensure due process of law for landlords and tenants, effective remedies

5

for violation of the law, and consistency with constitutional requirements."[4]

B.   *In 1993, the Board Granted a Category C Removal Permit to 20th Street Owner*

In 1989, 20th Street Owner purchased the 20th Street property for $880,000.[5]  The 20th Street property, which consisted of 13 residential rental units, was registered with the Board on June 15, 1979.  The 20th Street property was in poor condition at the time of purchase.

On June 14, 1993, 20th Street Owner filed an application for a Category C removal permit.  The application stated it was "hereby made for a permit to remove a controlled rental unit from the residential rental market pursuant to the Santa Monica City Charter . . . and the rules and regulations of the [Board]."  20th Street Owner indicated on the application that the removal was for "Renovation of Building."

On October 14, 1993, the Board held a hearing on 20th Street Owner's application.  At the hearing, the Board discussed a staff report, including findings by its property inspector.  The staff report found that the 20th Street property was

---

[4]   We previously granted the Board's request for judicial notice of the Rent Control Law as adopted by the voters on November 6, 1984.

[5]   James Corrigan purchased the property with another person having a 10 percent interest.  By 1990, Corrigan was the sole owner.  The property's owner eventually became 1041 20th Street, LLC, with Corrigan as the company's owner and manager.

uninhabitable, the costs for repairs to bring the building to a habitable condition exceeded the maximum collectable rent, and the owner would not be able to repair the property to habitability in an economically feasible manner.

At the hearing, a Board commissioner asked a Board staff attorney to describe the effect of a Category C removal permit. The two engaged in the following exchange:

"COMMISSIONER []: Why don't you walk through it with me. What is the meaning of the Category 'C' removal at this point?

"[STAFF ATTORNEY]: It means that Mr. Corrigan can rent these units for whatever he wishes. They are no longer subject to rent control.

"COMMISSIONER []: They go to market, they're called market rates, rental rates.

"[STAFF ATTORNEY]: Right, right. If, in fact, he wished to redevelop this property, the [R]ent [C]ontrol Board would sign off on any development permit that came before it, the staff would. *We would settle it as a property that was not governed by rent control*."[6]  (Italics added.)

On October 14, 1993, following the hearing, the Board granted 20th Street Owner a removal permit, and made the following findings:  "1. The subject property is uninhabitable . . . . [¶]  2. The repairs necessary for habitability cannot be completed in an economically feasible manner."

---

[6]     The audio recording of the October 14, 1993, hearing was played during the 2016 administrative hearing, and was transcribed as part of that hearing.

C.    *In 1994, the Board Granted a Category A Removal Permit to Ocean Avenue Owner*

On May 14, 1987, Ocean Avenue Owner purchased the Ocean Avenue property, which was comprised of 70 residential rental units.[7]  On March 31, 1994, Ocean Avenue Owner applied for a Category A removal permit for seven of its 70 units.[8]  As with 20th Street Owner's application, the first paragraph of Ocean Avenue Owner's application provided that it was for "a permit to remove a controlled rental unit from the residential rental market pursuant to the Santa Monica City Charter . . . and the rules and regulations of the [Board]."

By the time of the hearing, three of the units for which Ocean Avenue Owner sought a removal permit were rented.  The staff report recommended that the Board grant the Category A removal permits for the remaining four units.

On July 14, 1994, the Board held a hearing.  On July 28, 1994, the Board issued its decision granting the removal

---

[7]    The Ocean Avenue property's prior address was 110-120 Pico Boulevard.  BLD Associates II, Ltd. was the owner who applied for the removal permit at issue.  The Ocean Avenue property went through several ownership changes.  On February 27, 2013, ASN Santa Monica, LLC purchased the Ocean Avenue property.

[8]    The Board repealed Regulation 5014(a), which governed Category A removal permits, on May 5, 1994.  Applications for Category A removal permits pending before the repeal were allowed to proceed.

permit as to three units, including the unit at issue, Unit 211, as the owner had rented one additional unit by this time.

D.    *The Board's Treatment of Removed Residential Rental Units as Exempt from Rent Control*

Following its issuance of the removal permits, the Board consistently treated all of 20th Street property's rental units and particular units of the Ocean Avenue property as exempt from rent control.  In its communications with 20th Street Owner and Ocean Avenue Owner, as well as in its internal communications, the Board unequivocally stated that the properties had been granted permanent exemptions from the Rent Control Law and did not need to be registered with the Board.

E.    *In 2016, the Board Notified 20th Street and Ocean Avenue Owners that Rental Units Remained Subject to Rent Control*

On January 27, 2016, an information analyst from the Board sent a letter to Ocean Avenue Owner, stating:  "Units # 211 [and others] at 1915 Ocean Avenue are subject to the Rent Control Law.  Although removal permits were granted for these units on July 14, 1994, they were not demolished or converted and continue to be used for residential rental purposes.  Accordingly, they remain subject to the Rent Control Law . . . ."

On March 7, 2016, J. Stephen Lewis, the Board's general counsel, sent a letter to a tenant in the 20th Street property advising that 20th Street Owner, after displacing tenants pursuant to a removal permit, had returned the property to the

9

rental market and thus the property was "fully subject to the rent level and eviction protections afforded under . . . Santa Monica's rent control law . . . ."

On March 16, 2016, Lewis sent an email to 20th Street Owner, acknowledging that Board staff had previously opined that "a removal permit is a permit to 'remove a property from rent control[.]'" Lewis continued, "Under the law's plain language, the Board granted you a permit to remove your property *from the rental housing market*. I understand that you did that, but that the property is now again being rented. The property is, therefore, subject to the rental control law." (Italics original.) Lewis indicated that the Board was not seeking recovery of any benefits that 20th Street Owner had gained during the period the 20th Street property was exempted from rent control. Lewis, however, instructed 20th Street Owner to register the 20th Street property's residential rental units with the Board without delay.

F.      *Excess Rent Complaints*

Following the Board's letters, various tenants of the 20th Street property and the Ocean Avenue property filed complaints with the Board, asserting that the owners had collected excessive rent under the Rent Control Law.[9]

---

[9]      For Unit 211 of the Ocean Avenue property, two excessive rent complaints were filed, one for the period of August 1, 2015, to February 9, 2016, and one for the period of March 2016 to August 17, 2016.

The Board conducted an administrative proceeding and found in favor of the tenants, concluded that the units were subject to rent control, and awarded the complaining tenants various amounts for excess rent. Among other findings, the Board concluded that it lacked authority under the Rent Control Law to grant permanent exemptions from rent control by a removal permit.

G.     *20th Street Owner's Petition for Writ of Administrative Mandamus and Complaint*

On March 20, 2017, 20th Street Owner filed a combined petition for writ of administrative mandamus and complaint for declaratory relief. It argued that the Board's current interpretation of the Rent Control Law, that is, that units for which the owner had previously obtained removal permits remained subject to rent control, was incorrect and not supported by past interpretation or policy.

20th Street Owner argued that under the doctrine of "administrative finality"— referring to the doctrine that an administrative agency cannot reopen or reconsider a final administrative decision—the Board had no authority to amend, modify, revoke, or otherwise nullify the 1993 granting of the removal permit. 20th Street Owner asserted that under the doctrine of equitable estoppel the Board was prohibited from "nullifying or revoking . . . vested rights . . . granted in . . . 1993 . . . ." It maintained that it had detrimentally relied on the Board's statement that the 20th Street property would be exempt from rent control by investing approximately $100,000 in the

11

property and obtaining a $2.55 million loan secured by the property.

20th Street Owner requested that the petition be granted and that the trial court issue a writ of administrative mandamus requiring the Board to set aside its determinations in the excess rent complaints and to order the Board to refund the registration fees imposed after March 2016. 20th Street Owner also requested various forms of declaratory relief, including that: (1) it was entitled to continue operating the 20th Street property without restrictions imposed by the Rent Control Law; (2) the Board had no authority to revoke or nullify its 1993 removal permit; (3) the Rent Control Law did not grant the Board any power or duty to revoke removal permits; (4) a removal permit under section 1803(t) removed "'a controlled rental unit from the rental housing market'" such that the unit could be rented free of rent control; and (5) fees paid after March 2016 should be refunded. 20th Street Owner also sought an award of costs and fees.

H.    *Ocean Avenue Owner's Petitions for Writ of Administrative Mandamus*

On September 26, 2016, Ocean Avenue Owner petitioned for a writ of administrative mandamus on the first excess rent complaint that had been filed by the tenant of Unit 211 of the Ocean Avenue property. Ocean Avenue Owner argued, among other theories, that the Board was equitably estopped from holding it liable for excessive rent, citing the Board's treatment of Unit 211 as permanently exempt from rent control. Ocean Avenue Owner sought to set aside the Board's decision in

connection with the first complaint, as well as an award of costs and fees.

On May 25, 2017, Ocean Avenue Owner petitioned for a writ of administrative mandamus regarding the second excess rent complaint to set aside the Board's decision, as well as an award of costs and fees.

I.      *Trial Court's Statements of Decision and Judgments*

On April 12, 2017, the trial court issued an order that the respective petitions of 20th Street Owner and Ocean Avenue Owner were related cases. On March 5, 2018, the court heard argument on all the petitions.

### 1.      20th Street property

On April 18, 2018, the trial court issued its statement of decision on 20th Street Owner's petition. The court found, contrary to the Board's decision, that 20th Street Owner had detrimentally relied upon the Board's representations that the 20th Street property was not under rent control by commencing and completing renovations and improvements in the total amount of $494,554.85. It further found that 20th Street Owner undertook loan obligations in 2002 and 2013 on the assumption that the loan would be repaid by rental proceeds based on market rents unrestricted by rent control.

On April 23, 2018, the trial court issued its amended judgment. The court ordered that a peremptory writ of administrative mandamus should issue, ordering the Board to reverse and set aside its decision in the excess rent complaints

against 20th Street Owner, and to reconsider those decisions in light of the court's findings of fact and conclusions of law. The court also declared that the Board "is equitably estopped from denying that since October 14, 1993 all thirteen (13) units of the subject property have been and are permanently exempt from the rent control laws and outside the jurisdiction of the [Board]."

### 2. Unit 211 of Ocean Avenue property

On May 23, 2018, the trial court issued its statement of decision on both of Ocean Avenue Owner's petitions. The court found the Board was "estopped from denying that the units are decontrolled units."[10] The court found the Board had delayed over 21 years before asserting that Unit 211 was not exempt from rent control.

---

[10] The court did not explain what it meant by the term "decontrolled units." In context, it appears the court considered "decontrolled units" to be rental units that are permanently exempt from rent control. As we will explain, "decontrol" under the Rent Control Law refers to a limited circumstance related to a high vacancy rate. (§ 1803(r).)

14

The trial court issued its judgment on May 23, 2018. The court ordered that a peremptory writ of administrative mandamus should issue, remanding the matter to the Board, and commanding that (1) the Board set aside and reverse its decision regarding the excessive rent complaints and (2) reconsider its decision in light of the statement of decision.[11]

---

[11] Although the matters were remanded to the Board for reconsideration, the judgments are final. """[I]t may be said that where no issue is left for future consideration except the fact of compliance or noncompliance with the terms of the first decree, that decree is final, but where anything further in the nature of judicial action on the part of the court is essential to a final determination of the rights of the parties, the decree is interlocutory."" (*Dhillon v. John Muir Health* (2017) 2 Cal.5th 1109, 1115.) Because the trial court ordered that the Board was equitably estopped from finding the removed rental units were subject to rent control, nothing remained to be done in the court, and the judgments are appealable.

## III.  DISCUSSION

A.  *The Trial Court Erred by Applying Equitable Estoppel*[12]

The Board contends that the trial court erred by applying the doctrine of equitable estoppel to require it to act beyond its statutory authority and in contravention of the Rent Control Law.  We agree.

"'The doctrine of equitable estoppel is founded on concepts of equity and fair dealing.  It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment.  The elements of the doctrine are that (1) the party to be estopped must be apprised of the facts; (2) he

---

[12]  20th Street Owner and the Board dispute whether this court should review the trial court's or the Board's factual findings for substantial evidence.  When an administrative decision affects a fundamental vested right, the trial court must exercise its independent judgment on the evidence.  (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1260 (*Schafer*).)  If no fundamental vested right is affected, the trial court reviews the agency's factual findings under the substantial evidence test.  (*Ibid.*)  On appeal, if the substantial evidence test applies below, this court reviews the agency's findings under the same substantial evidence test.  (*Antelope Valley Press v. Poizner* (2008) 162 Cal.App.4th 839, 851.)  Likewise, if the independent judgment test applies, we review the trial court's findings under the substantial evidence test.  (*Ibid.*)

We ultimately need not decide whether a fundamental vested right was affected.  The material facts are undisputed and we will assume for purposes of this appeal that each of the elements of equitable estoppel exists.

16

must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. [Citation.]'" (*City of Goleta v. Superior Court* (2006) 40 Cal.4th 270, 279; accord, *Estill v. County of Shasta* (2018) 25 Cal.App.5th 702, 710-711; *Attard v. Board of Supervisors of Contra Costa County* (2017) 14 Cal.App.5th 1066, 1079.)

"The doctrine of equitable estoppel may be applied against the government where justice and right require it." (*Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 306.) "Where, as here, a party seeks to invoke the doctrine of equitable estoppel against a governmental entity, an additional element applies. That is, the government may not be bound by an equitable estoppel in the same manner as a private party unless, 'in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel.' (*Long Beach v. Mansell* (1970) 3 Cal.3d 462, 496-497 . . . .)" (*City of Oakland v. Oakland Police & Fire Retirement System* (2014) 224 Cal.App.4th 210, 240; see *Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 994-995 ["estoppel will not be applied against the government if to do so would nullify a strong rule of policy adopted for the benefit of the public"].)

However, "principles of estoppel may not be invoked to directly contravene statutory limitations." (*Medina v. Board of Retirement* (2003) 112 Cal.App.4th 864, 869; accord, *In re Joshua G.* (2005) 129 Cal.App.4th 189, 197; *Emma Corp. v. Inglewood Unified School Dist.* (2004) 114 Cal.App.4th 1018, 1028-1029; see

17

*Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 28 ["no court has expressly invoked principles of estoppel to contravene directly any statutory or constitutional limitations"]; *Santa Monica Unified Sch. Dist. v. Persh* (1970) 5 Cal.App.3d 945, 953 ["the principal of estoppel is not applicable to a municipal agency which has not acted in compliance with a statute which is the measure of its power"].)

"The existence of equitable estoppel generally is a factual question for the trier of fact to decide, unless the facts are undisputed and can support only one reasonable conclusion as a matter of law." (*Schafer, supra,* 237 Cal.App.4th at p. 1263; *Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1360.) Questions of law are reviewed de novo. (*Schafer, supra*, 237 Cal.App.4th at p. 1264.)

We consider whether the application of equitable estoppel here, to require the Board to permanently exempt the 20th Street property and Unit 211 of the Ocean Avenue property from rent control regulations, would require the Board to act in excess of its authority. According to 20th Street Owner, the granting of a removal permit exempts rental units from rent control; in other words, section 1803(t) authorizes the Board to exempt rental units from rent control regulations. The plain terms of section 1803(t), however, do not support this position. That section provides that "[a]ny landlord who desires to remove a controlled rental unit *from the rental housing market* by demolition, conversion or other means is required to obtain a permit from the Board prior to such removal from the *rental housing market*." (§ 1803(t), italics added.) A "market" is "[a] place of commercial activity in which goods or services are bought and sold." (Black's Law Dict. (10th ed. 2014) p. 1113, col. 2.) Thus, section 1803(t)

18

"prevent[s] landlords from evicting tenants in order to go out of the residential housing business absent permits from the City and the Board. (*City of Santa Monica v. Yarmark* (1988) 203 Cal.App.3d 153, 157 . . . .)" (*Santa Monica Rent Control Bd. v. Bluvshtein* (1991) 230 Cal.App.3d 308, 314.) Removal permits allow "removal from the rental housing market"; they do not allow removal from the rent control market. (§ 1803(t)(1).) ""'If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.'"" (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.)

Had voters intended for a removal permit to remove a unit from regulation (rather than from the rental housing market), they could have so stated. Indeed, voters knew how to exempt properties from rent control and did just that in section 1801(c), which provides that: "All residential rental units in the City [are subject to the Rent Control Law] . . . except single family homes . . . and those units found by the Board to be exempt under one or more of the following provisions[.]"[13] (§ 1801(c).) None of the

---

[13] The listed exemptions under section 1801(c) are: "[r]ental units in hotels, motels, inns, tourist homes and rooming and boarding houses"; "[r]ental units in any hospital, convent, monastery, extended medical care facility, asylum, non-profit home for the aged, or dormitory owned and operated by an institution of higher education"; "[r]ental units which a government unit, agency or authority owns, operates, manages, or in which governmentally subsidized tenants reside"; "[r]ental units in owner-occupied dwellings with no more than three (3) units"; "[r]ental units and dwellings constructed after the adoption of this Article"; and "[w]here a unit is actually used for

19

listed exemptions includes a unit that is the subject of a section 1803(t) removal permit. (*Mason v. Retirement Board* (2003) 111 Cal.App.4th 1221, 1229 ["we must '"construe every statute with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness"'"].) "'"[I]f exemptions are specified in a statute, [courts] may not imply additional exemptions unless there is a clear legislative [history] to the contrary. [Citation.]"'" (*Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 389.) We observe no such legislative history to the contrary.

Nor does section 1801(c) or any other provision of the Rent Control Law authorize the Board to create new categories of properties that are exempt from rent control. An administrative agency, such as the Board, can only act within the scope of its delegated authority. (See *Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 391 ["Administrative action that is not authorized by, or is inconsistent with, acts of the Legislature is void"]; *Schneider v. California Coastal Com.* (2006) 140 Cal.App.4th 1339, 1348 [same]; *City and County of San Francisco v. Board of Permit Appeals* (1989) 207 Cal.App.3d 1099, 1109-1110 [administrative appeals board had no power to disregard or amend ordinances defining its authority].)

The Rent Control Law provides the Board with the following powers and duties: to set rent ceilings for all controlled rental units; to require registration of all controlled rental units

purposes of providing, on a non-profit basis, child care or other residential social services." None of these exemptions are applicable in this case.

20

(§ 1803(q)); to establish a base rent ceiling (§ 1804(b)); to make adjustments to the rent ceiling (§ 1805); to set rents at fair and equitable levels to achieve the intent of the Rent Control Law; to hire and pay necessary staff to issue orders, rules and regulations, conduct hearings, and charge fees; to make studies, surveys, and investigations, conduct hearings, and obtain information necessary to carry out its powers and duties; to report annually to the City Council of the City of Santa Monica on the status of controlled rental housing; to remove rent controls (§ 1803(r))[14]; to issue permits for removal of controlled rental units from the rental housing market (§ 1803(t)); to administer oaths and affirmations and subpoena witnesses; to establish rules and regulations for deducting penalties and settling civil claims (§ 1809); to refer violations of the Rent Control Law to appropriate authorities for criminal prosecution; to seek

---

[14] Section 1803(f)(9) provides that the Board can "[r]emove rent controls under [s]ection 1803(r)." Section 1803(r), entitled "Decontrol," states that the Board can temporarily remove rent controls from rental units when there is no housing shortage, as measured by a high vacancy rate. Specifically, "[i]f the average annual vacancy rate in any category, classification, or area of controlled rental units exceeds five (5) percent, the Board is empowered, at its discretion and in order to achieve the objectives of this Article, to remove rent control from such category, classification or area." (§ 1803(r).) If a unit is decontrolled under section 1803(r), the Board shall reimpose rent control if the average annual vacancy rate falls below five percent. Thus, decontrol of rental units under section 1803(r) does not permanently remove a rental unit from rent control. 20th Street Owner expressly asserts that section 1803(r) does not apply.

injunctive and other civil relief (§ 1811); and to charge and collect registration fees, including late payment penalties. (§ 1803(f).) Furthermore, the Board "shall issue and follow such rules and regulations, including those which are contained in this Article, as will further the purposes of the Article." (§ 1803(g).) None of these listed powers and duties authorize the Board to create categories of rental properties that are exempt from rent control.

We conclude the Board was not authorized to exempt the owners' residential rental units from rent control.[15] Accordingly, the trial court erred in concluding that the Board was equitably estopped from denying that the residential rental units that were the subject of removal permits were permanently exempt from rent control. As that was the sole basis for the grant of the petitions for writ of administrative mandamus, the trial court likewise erred by granting the petitions on this ground.

B.    *The Board Did Not Revoke or Modify the Removal Permits*

20th Street Owner contends that we should affirm the trial court's judgment on alternative grounds. It first argues that the Board's effort to regulate its property is equivalent to revoking the removal permit, which the Board lacks authority to do under the Rent Control Law. Ocean Avenue Owner also raised this argument before the trial court.

As we noted above, the Rent Control Law enumerates the powers and duties of the Board, which include authority to issue

---

[15]    We do not express any opinion on whether the doctrine of equitable estoppel could apply to require the Board to act in a manner that is expressly authorized by the Rent Control Law.

22

removal permits, but not to revoke such permits. Even assuming for purposes of this opinion that the Board was not authorized to revoke removal permits, the Board did not revoke such permits in 2016. As the Board concedes, the removal permits remain valid and the owners can thus remove the rental units from the rental housing market by demolition, conversion, or other means. Rather, the Board, in 2016, changed its interpretation of section 1803(t) to conclude, correctly, that a removal permit did not exempt a rental unit from rent control.

""""In the general case, of course, an administrative agency may change its interpretation of a statute, rejecting an old construction and adopting a new. [Citations.] Put simply, 'an administrative agency is not disqualified from changing its mind . . . .' [Citation.]""" (*Citicorp North America, Inc. v. Franchise Tax Bd.* (2000) 83 Cal.App.4th 1403, 1420; *Californians for Political Reform Foundation v. Fair Political Practices Com.* (1998) 61 Cal.App.4th 472, 488.) Accordingly, we conclude that the Board did not revoke the section 1803(t) removal permits; it merely changed its interpretation of these permits to clarify that they did not operate to exempt units from rent control.

C.    *The Doctrine That an Administrative Agency May Not Reopen or Reconsider a Prior Decision Does Not Compel Affirmance*

20th Street Owner contends that the Board is bound by its prior 1993 decision, regardless of whether it was contrary to the Rent Control Law. 20th Street Owner cites *Olive Proration etc. Com. v. Agri. etc. Com.* (1941) 17 Cal.2d 204 (*Olive Proration*) in support of its contention. The court in *Olive Proration* held:

23

"[T]he question whether the administrative agency may reverse a particular determination depends upon the kind of power exercised in making the order and the terms of the statute under which the power was exercised.  As to the first factor, almost without exception, courts have held that the determination of an administrative agency as to the existence of a fact or status which is based upon a present or past group of facts, may not thereafter be altered or modified." (*Id.* at p. 209.)  *Olive Proration* does not support affirmance here.

We will assume for purposes of this appeal that the doctrine of administrative finality precluded the Board from reconsidering its granting of a removal permit to 20th Street Owner in 1993.  In granting the Category C removal permit, the Board concluded that the 20th Street property was uninhabitable and could not be made habitable in an economically feasible manner.  Even if the Board could not revisit that decision 23 years later, that is not what the Board did here.  As discussed above, the Board has conceded that 20th Street Owner remains free to remove its units from the rental housing market, even if the property is now habitable.

To the extent 20th Street Owner argues that the Board may not reconsider its prior conclusion that removal permits exempt units from rent control, the doctrine of administrative finality does not apply when an agency acts beyond its authority: "Implicit in the cases denying a board's power to review or reexamine a question, however, is the qualification that the board must have acted within its jurisdiction and within the powers conferred on it.  Where a board's order is not based upon a determination of fact, but upon an erroneous conclusion of law, and is without the board's authority, the order is clearly void

24

. . . ." (*Aylward v. State Board etc. Examiners* (1948) 31 Cal.2d
833, 839; *Helene Curtis, Inc. v. Los Angeles County Assessment
Appeals Bds.* (2004) 121 Cal.App.4th 29, 39-40.)  Accordingly, the
doctrine that an administrative agency cannot reconsider a final
administrative decision does not operate here to require the
Board to exempt the 20th Street property's rental units or Unit
211 of the Ocean Avenue property from rent control.[16]

D.      *A Landlord's Entitlement to a Constitutionally Fair Return
        is Not Affected by the Board's Interpretation of
        Section 1803(t)*

        20th Street Owner contends that the Board's current
interpretation of section 1803(t) violates its constitutional right to
a fair return, citing *City of Berkeley v. City of Berkeley Rent
Stabilization Bd.* (1994) 27 Cal.App.4th 951 (*City of Berkeley*).  In
*City of Berkeley*, the court held:  "[A] rent control provision which
does not permit a just and reasonable return on a landlord's
investment is confiscatory; and if a rent control measure does not
expressly assure the landlord of that fair return on investment,
such a condition will be implied." (*Id.* at p. 962, citing *Birkenfeld
v. City of Berkeley* (1976) 17 Cal.3d 129, 169.)  We disagree with
20th Street Owner's reliance on *City of Berkeley*.

        One purpose of the Rent Control Law is to provide
consistency with constitutional requirements such as allowing

---

[16]     We also reject 20th Street Owner's related argument that
res judicata and collateral estoppel require affirmance of the
judgment.  The Board's 1993 decision granting a removal permit
as to the 20th Street property's rental units remains in effect.

25

landlords a fair return.  (§ 1800.)  To accomplish this purpose, the Board is empowered to adjust the rent ceiling and set rents at fair and equitable levels.  (§ 1803(f)(4), (5).)  Section 1805(c) allows a landlord to petition for an increase to the maximum allowable rent.  Section 1805(e) provides that the Board may consider all relevant factors in determining its fair return formula, including:  "increases or decreases in operating and maintenance expenses," "necessary and reasonable capital improvement of the controlled rental unit as distinguished from normal repair, replacement and maintenance," "substantial deterioration of the controlled rental unit other than as a result of . . . wear and tear," "the landlord's rate of return on investment, the landlord's current and base date Net Operating Income, and any other factor deemed relevant by the Board in providing the landlord a fair return."  Thus, the Rent Control Law as written does not deprive 20th Street Owner of receiving a constitutionally fair return.  Furthermore, as *City of Berkeley*, *supra*, 27 Cal.App.4th 951 held, any rent setting power "[is] expanded by the constitutional requirement that the Board provide landlords with a just and reasonable return on investment."  (*Id.* at p. 962.)  Because 20th Street Owner has not petitioned for an increase to the maximum allowable rent, any argument it will not receive a constitutionally fair return is not ripe for review.  (See *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 169 ["a basic prerequisite to judicial review of administrative acts is the existence of a ripe controversy"].)  Accordingly, 20th Street Owner's argument that the Board's, and this court's, interpretation of section 1803(t) will prevent it from receiving a constitutionally fair return is unavailing.

26

## IV.  DISPOSITION

The judgments are reversed.  On remand, the trial court is directed to deny 1041 20th Street, LLC's petition for writ of administrative mandamus and complaint for declaratory relief, and ASN Santa Monica, LLC's petitions for writ of administrative mandamus.  The Santa Monica Rent Control Board is entitled to recover its costs on appeal.

KIM, J.

We concur:

BAKER, Acting P. J.

MOOR, J.